**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

--------------------------------------------------------------- X

TAYLER ULMER, SERGIO GIANCASPRO,  :
CORI ERSHOWSKY, ALEXIS GERACI,   :   Civil Action No.  22-cv-05662
JAMERE BOWERS, and ADAKU IBEKWE on  :
behalf of themselves and all similarly situated  :
employees,                          :
                                    :   **AMENDED**
                                    :   **CLASS ACTION COMPLAINT**
                       Plaintiffs,  :
                                    :
            v.                      :   **Jury Trial Demanded**
                                    :
STREETTEAM SOFTWARE, LLC d/b/a      :
POLLEN, NETWORK TRAVEL EXPERIENCES,  :
INC., JUSEXPERIENCES UK LIMITED,    :
CALLUM NEGUS-FANCEY, LIAM NEGUS-    :
FANCEY, and JAMES ELLIS,            :
                                    :
                       Defendant.   :

--------------------------------------------------------------- X

Plaintiffs Tayler Ulmer ("Ulmer"), Sergio Giancaspro ("Giancaspro"), Cori Ershowsky

("Ershowski"), Alexis Geraci ("Geraci"), Jamere Bowers ("Bowers"), and Adaku Ibekwe

("Ibekwe")(collectively with Ulmer, Giancaspro, Ershowski, Geraci, and Bowers, "Plaintiffs")

on behalf of themselves and all others similarly situated, allege for their Complaint against

Defendants StreetTeam Software, LLC d/b/a Pollen ("StreetTeam"), Network Travel

Experiences, Inc., ("NTE"), JusExperiences UK Limited ("JusExperiences"), Callum Negus-

Fancey, Liam Negus-Fancey, and James Ellis ("Ellis")(collectively with StreetTeam, NTE,

JusExperiences, Callum Negus-Fancey, Liam Negus-Fancey, "Defendants") as follows:

## PRELIMINARY STATEMENT

1.     NTE and StreetTeam are U.S. subsidiaries of international music and travel

startup StreetTeam Software Limited ("StreetTeam UK"), all doing business as "Pollen."  The

London-based startup, founded by two mega-wealthy brothers, Callum and Liam Negus-Fancey,

1

threw large and lavish music festivals and parties around the world.  Pollen is a destination events company that specializes in the fields of travel, festivals, entertainment, experiences and youth culture.  It markets itself as an invite-only marketplace using influencer marketing for experiences and events.  The company partners with brands such as Live Nation, MGM Resorts and Universal Music Group and integrates with ticket providers such as Ticketmaster, Eventbrite, Priceline and Stubhub.

2.      In April 2022, Pollen's co-founders and president bragged that the company raised $150 million in funding from six well-known venture capital funds.  This was in addition to the $100 million dollars it previously raised.

3.      Pollen apparently used this huge influx of money to pay for, among other things, the "housing" and "entertainment" expenses of the Pollen's co-founders, Callum Negus-Fancey (Chief Executive Officer) and Liam Negus-Fancey (Chief Operating Officer).

4.      Sadly, in June 2022, Pollen stopped paying its hard-working employees. Nonetheless, it urged those employees to continue working, claiming that it was in the "final stages of negotiating a transaction" and promising that, once it did so, it would pay "all that you [the employees] are owed."  That never happened.  Instead, Pollen terminated Plaintiffs and scores of other employees after repeated inquiries about the late and missing paychecks.

5.      Plaintiffs bring this action on behalf of themselves and all other similar Pollen employees pursuant to Federal Rule of Civil Procedure 23 to remedy violations of the WARN Act, 29 U.S.C. § 2102, the Fair Labor Standards Act, 29 U.S.C. § 216(b), and violations of state and local laws in addition to claims for breach of contract and fraud claims.

## JURISDICTION AND VENUE

6.      The District Court has original jurisdiction of this civil action pursuant to 28

U.S.C. § 1338(a) because this action arises, in part, under federal statute including the Worker

Adjustment and Retraining Notification Act, 29 U.S.C. § 2102 ("WARN Act"), and the Fair

Labor Standards Act, 29 U.S.C. § 201, et seq. ("FLSA").

7.      The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28

U.S.C. § 1367.

8.      Venue is proper under 28 U.S.C. § 1391(b) as a substantial part of the events

giving rise to this case occurred in the Eastern District of New York.  Plaintiff Ulmer was

employed at all relevant times in this District and her wages and benefits were due in this

District.

## PARTIES

9.      Ulmer is a resident of Kings County, New York.  Ulmer worked for Defendants in

New York.  Defendants failed to pay Ulmer her earned wages from July through August 10,

2022, and without prior notice, on or about August 10, 2022, Defendants laid off Ulmer effective

immediately.  At all relevant times, Ulmer met the definition of an "employee" and/or "eligible

employee" under all applicable statutes.

10.      Giancaspro is a lawful permanent resident of the United States and a resident of

California.  Giancaspro worked for Defendants in the Los Angeles area.  Defendants failed to

pay Giancaspro his earned wages from July through August 10, 2022, and also failed to provide

guaranteed employee benefits or reimburse his reasonable and necessary business expenses.

Without prior notice, on or about August 10, 2022, Defendants laid off Giancaspro effective

immediately.  At all relevant times, Giancaspro met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

11.     Ershowski is a citizen and resident of California.  Ershowski worked for Defendants in the Los Angeles area.  Defendants ceased paying Ershowski as of July 1, 2022.  They also ceased providing guaranteed employee benefits such as health insurance or 401(k) contributions in June 2022.  Defendants also ceased reimbursing Ershowski's reasonable and necessary business expenses.  On or about August 10, 2022, Defendants laid off Ershowski without warning or notice.  At all relevant times, Ershowski met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

12.     Geraci is a citizen and resident of New York.  Geraci was staffed from Defendants' U.S. headquarters in Los Angeles and worked remotely from New York.  Defendants ceased paying Geraci's earned wages as of July 1, 2022, and discontinued guaranteed employee benefits and reimbursement of reasonable and necessary business expenses.  On or about August 10, 2022, Defendants laid off Geraci without warning or prior notice, effective immediately.  At all relevant times, Geraci met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

13.     Bowers is a citizen and resident of Wisconsin where he moved after being laid off by Defendants.  At all relevant times, he worked for Defendants remotely from the Las Vegas, Nevada area.  He was staffed from Defendants' Los Angeles headquarters.  Defendants ceased paying Bowers' earned wages as of July 1, 2022, and discontinued guaranteed employee benefits and reimbursement of his reasonable and necessary business expenses.  On or about August 10, 2022, Defendants laid off Bowers without warning or prior notice.  At all relevant times, Bowers met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

4

14. Ibekwe is a citizen and resident of California and worked for Defendants in the Los Angeles area at all relevant times. On or about May 10, 2022, Defendants laid off Ibekwe without prior notice or warning. StreetTeam then entered into a severance agreement with Ibekwe, committing to pay her severance of $16,666.67. Defendants have made no part of this severance payment. On information and belief, Defendants had no intention of performing at the time they entered into the severance agreement. At all relevant times, Ibekwe met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

15. StreetTeam Software, LLC d/b/a Pollen is a Delaware limited liability company with its principal place of business in Henderson, Nevada, and is an affiliate of the business enterprise referred to herein and known as "Pollen." StreetTeam operates in the United States under the business name "Pollen." At all relevant times, Pollen met the definition of an "employer" under all applicable statutes.

16. NTE is a Delaware corporation with its principal place of business in Los Angeles, California, and is an affiliate of the business enterprise referred to herein and known as "Pollen." NTE also operates in the United States under the business name "Pollen."

17. JusExperiences is a United Kingdom private limited company with its principal place of business in London, United Kingdom. JusExperiences is also an affiliate of the business enterprise referred to herein and known as "Pollen." It does business in the United States and abroad under that name.

18. Each of NTE, StreetTeam, and JusExperiences are referred to herein as the "Entity Defendants."

19. Callum Negus-Fancey is, on information and belief, a citizen and resident of London, United Kingdom. He is the co-founder of the Entity Defendants and served as the Chief

Executive Officer ("CEO") of their parent company, StreetTeam UK.  He also served as the CEO of Defendant StreetTeam.

20.     Liam Negus-Fancey is, on information and belief, a citizen and resident of London, United Kingdom.  He is the co-founder of the Entity Defendants and served at all relevant times as the Chief Revenue Officer ("CRO") of their parent company, StreetTeam UK.

21.     James Ellis is, on information and belief, a citizen and resident of London, United Kingdom.  Ellis served as the President of StreetTeam UK and the CEO, Chief Financial Officer ("CFO"), and Secretary of NTE.

22.     Callum and Liam Negus Fancey, and Ellis are collectively referred to herein as the "Individual Defendants."

## ENTITY AND INDIVIDUAL LIABILITY

### I.     Single Enterprise and Alter Ego

23.     "Pollen" is not a single business entity, but a global enterprise and "brand" used to promote events.  The enterprise operates through a complex web of an estimated 20-plus affiliated entities in the United States, the United Kingdom, and elsewhere, including the following in addition to NTE and StreetTeam:

    a.      Lets Go Crazy Limited

    b.      Lets Go Crazy Holdings Limited

    c.      Lets Go Crazy Music Limited

    d.      YourVine Limited

    e.      Freemavens Limited

    f.      The Physical Network Limited

    g.      The Physical Network LLC

      h.       Lets Go Group Limited

      i.        StreetTeam Software Limited

      j.        Beyond.Life Ltd

      k.       JusExperiences UK Limited (2019) d/b/a "Trippr," formerly Justours UK

      l.        Justours, Inc.

      m.      2504030 Ontario Inc.

      n.       JusCollege Mexico

      o.       2504031 Delaware Inc.

      p.       Freelivin Entertainment, Inc.

      q.       Ibiza International Music Summit SL.

24.     All of these entities operate using the same business name, "Pollen," through shared websites and offices.  All of them share combined business operations and management, share offices, and operate as mere constituent parts of the same enterprise, and a conduit for the business affairs of the others.  Most of these entities are presently dissolved, in insolvency proceedings, or have been closed.

25.     All of the operating Pollen entities, including the Entity Defendants, are beneficially owned and controlled by non-party StreetTeam UK.  StreetTeam UK is, and at all relevant times was, dominated and controlled by its founders, Defendants Callum and Liam Negus-Fancey, who served as its officers and own a substantial share of the stock through a series of holding companies.  The entire Pollen enterprise operated under the direction and control of the London-based leadership team or "LT," headed by the Negus-Fancey brothers and Ellis.

26.     These entities have been formed and operated in a manner designed to obscure their true identities and the nature and scope of their operations, making it exceedingly difficult for employees and other creditors to collect on valid debts.  Defendants have provided false and misleading information to both Plaintiffs and class members and governmental authorities as to which entity or entities employed various employees.

27.     Plaintiffs are informed and believe that Pollen also opened multiple other U.S. entities, shell companies, and holding companies, which have not yet been identified.  Once these entities are identified in discovery Plaintiffs will amend this Complaint to name them as Defendants herein.

28.     Plaintiffs are informed and believe that all of the Pollen entities, including the Entity Defendants, operated from shared offices and shared interlocking officers, employees, and managers, including the Negus-Fancey brothers and Ellis.  Each of the Pollen entities did business in the United States as "Pollen."  The Individual Defendants failed to observe basic corporate formalities and treated the Entity Defendants interchangeably.  On information and belief, this included sharing of employees and resources, commingling and improper transfers of funds, and disregard of corporate formalities.  In addition, Defendants were wholly undercapitalized, leading to the losses alleged herein.

29.     Employees in the United States were sometimes hired by one of the Defendant companies and then paid by another, or sometimes both.  Other employees received payroll from one entity but benefits from another.  Still others were paid in the United States by offshore affiliates.  In some instances, employees were designated for tax purposes as employees of "The Physical Network," an entity which no longer exists.

30.     The Negus-Fancey brothers and other company executives also used the Pollen entities for personal ends.  For example, they took substantial company funds for personal use in the form of excessive housing and relocation allowances, sham "entertainment" expenses, and the like.  In one instance, Mr. Negus-Fancey spent $60,000 in company funds on a Spanish villa for his wedding, writing it off as accommodations for "key clients."

31.     Parent entities in the corporate family and the founders themselves have held themselves out as being obligated for the debts of the Entity Defendants.  For example, to receive an exemption from financial reporting requirements, StreetTeam UK—which is insolvent—purported to guarantee all of the debts of JusExperiences.  In addition, StreetTeam UK's primary lender claims that all its subsidiaries guaranteed the debts of StreetTeam UK.  Likewise, when the company discontinued normal payroll in June 2022 and paid employees by wire, Liam Negus-Fancey reported that the founders had "underwritten" this wire.  In another instance, Ellis reported that he had personally made payroll payments.

32.     Defendants, including the founders, made numerous material misrepresentations to employees about the financial condition of the Entity Defendants to induce them to continue working without pay.  They did so knowing that the Entity Defendants were insolvent and would be unable to pay payroll and benefits as promised.  In addition, the Individual Defendants continued to take money out of the company despite being unable to make payroll, prioritizing payments to themselves above employees' earned wages.  In addition, Defendants have actively diverted and dissipated funds and revenue in which Plaintiffs and class members hold a priority, secured claim, using this web of offshore affiliates.

33.     Because they operate as a single enterprise, Defendants are each liable for the debts of the other Defendants.  In addition, as the Entity Defendants' principals, the Individual Defendants are liable for the obligations of the Entity Defendants as alter egos.

II.    **Individual Liability**

34.     The Individual Defendants had significant ownership interests in the Pollen enterprise, directly and beneficially, exercised day-to-day control over the operations of Defendants, maintained hiring and firing power over all employees, and were directly involved in the supervision and payment of employees.

35.     Defendant Callum Negus-Fancey was at relevant times the CEO of parent company StreetTeam UK, and the CEO of Defendant StreetTeam.  Defendant Liam Negus-Fancey was the CRO of StreetTeam UK at all relevant times.  Defendant Ellis was the President of parent company StreetTeam UK, and the CEO, CFO, and Secretary of NTE at relevant times. On information and belief, Ellis was primarily responsible for managing the Entity Defendants' operations in the United States.

36.     Each of the Entity Defendants operated under the direct control of the Individual Defendants, who were the officers and major beneficial shareholders.  Each of the Individual Defendants is, thus, an "employer" within the meaning of the FLSA, which defines liable "employers" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d); *see also Boucher v. Shaw*, 572 F.3d 1087 (2009).

37.     Similarly, each of them is liable for unpaid wages pursuant to state laws as the owners, directors, officers, and managing agents of the Entity Defendants.

### III.    <u>Successor Liability</u>

38.    Defendant JusExperiences is liable for the obligations of the other Entity Defendants as their successors in interest.  JusExperiences represents a mere continuation of the business of the other Entity Defendants, and its assumption of their business operations was designed to avoid Plaintiffs' claims and obligations to other creditors.

39.    Just days after purporting to shut down operations through NTE and StreetTeam, Pollen diverted its U.S. operations to JusExperiences, which it selectively kept out of insolvency proceedings.  JusExperiences has continued the same business as NTE and StreetTeam, using the same business names, brands, promotions, websites, and systems, and marketing the same types of events.  It continues to employ the same offices, officers, assets, business names, brands, and a small number of remaining employees as NTE and StreetTeam.

40.    In addition, Plaintiffs are informed and believe that the Individual Defendants have formed or are in the process of forming new companies to conduct the same business.  Plaintiffs will amend this complaint to name the new entities when the nature of their involvement becomes known.

<b><u>FACTS COMMON TO ALL CLAIMS</u></b>

### I.    <u>Pollen's Rise as a Producer of High-End Music Festivals</u>

41.    Founded in 2014, Pollen billed itself as a leader in producing high end music festivals, college trips, and other events around the world.

42.    It offered events in exotic destinations, featuring superstar entertainers of the likes of Justin Bieber and 50 Cent.  Customers purchased event access and accommodations ranging well into the thousands of dollars per guest.  Pollen reported that over 400,000 people travelled around the world to attend its events.

11

43.     Over its history, Pollen purportedly raised over $200,000,000 in investment capital from various sources, including prominent venture capital funds and the British government's Future Fund.

44.     Through its U.S. affiliates NTE and StreetTeam, Pollen hired Plaintiffs and hundreds of other full-time employees in the United States.  All or substantially all of these employees worked remotely.

**II.      Pollen Faces Financial Distress**

45.     Despite raising massive amounts of money, Pollen badly mismanaged its finances to the detriment of its investors, customers, and employees.  The company lost over $150,000,000 between 2019 and 2021.  Unbeknownst to employees, Pollen stayed afloat during 2019 through 2021 by taking large loans.

46.     In 2021 into 2022, Pollen cancelled multiple events, sometimes days before they were set to start, and at least once, after guests had already arrived.  Customers reported publicly that Pollen either persistently delayed in refunding payments for cancelled events, or failed to refund them altogether, prioritizing refunds for those who complained publicly on social media. On information and belief, Pollen lacked funds to make full refunds to customers, and was reliant on selling new events to secure funds needed to refund customers on past events.

47.     During this period, Pollen routinely failed to pay vendors in a timely manner.  On information and belief, on more than one occasion, customers would arrive at a hotel that they had booked and paid for through Pollen, only to learn that Pollen had never purchased their accommodations.

48.     Beginning in late 2021, Pollen consistently missed its payroll schedule.  Each time, the company would blame logistical issues, such as Pollen's payroll processor, TriNet.

12

49.     In April of 2022, Pollen announced publicly and internally that it had raised $150,000,000 in investor capital.  These representations were false.  Later public filings show that Pollen only brought in approximately $1,000,000.  The rest was used to retire or convert large outstanding debts that Pollen had amassed during 2019 through 2021.

50.     On May 10, 2022, Pollen laid off 200 employees, representing approximately one third of its workforce.  At that time, the company claimed that these layoffs were a one-time cost-cutting measure agreed upon with the investors.

51.     In May 2022, Pollen charged customers $3.2 million early for upcoming events through its payment-processing software.  The company claimed that this was "accidental," due to a software glitch.  Rather than reverse the transactions, however, the company offered to make refunds to customers within 30 days or to give them a credit if they allowed the company to keep the early payment.

52.     Pollen fired its CFO on May 18, 2022 without explanation.  On information and belief, the company was also facing whistleblower reports of financial mismanagement and embezzlement.

53.     On May 19, 2022, Pollen hosted a companywide town hall meeting for employees in which company leadership continued to reassure employees.  During this meeting, company director Leila Rastegar Zegna sang the praises of the company founders and told employees companywide that she continued to believe in the company's vision.  Unbeknownst to employees, Ms. Zegna had formally resigned her board position the previous day.

54.     According to later company filings, all of Pollen's outside directors—many of them investor representatives—left the company *en masse* between May and June 2022.

13

Plaintiffs are informed and believe that in the summer of 2022, one of Pollen's major investors wrote its investment holdings down to zero.

55.     In July of 2022, Pollen engaged investment bank Goldman Sachs to locate a buyer for its entire operation.  These efforts were unsuccessful.

56.     Throughout this time, Pollen's senior management, including CEO Callum Negus-Fancey, continued to use company funds for personal expenses, such as a company car, housing and relocation allowances, purported client entertainment, and the like.

**III.     Pollen Fails to Pay Its Staff or Provide Benefits**

57.     Despite its increasing financial distress, Pollen senior management continued to represent to employees that their jobs were secure and that Pollen would have no problem making payroll.  It continued to make these representations into July and August 2022.  When directly confronted by employees about Pollen's financial condition, company leadership assured them (including in writing) that they would receive all they were owed.

58.     Defendants entered into severance agreements with many of the employees laid off in May 2022.  Defendants never made good on their severance contracts.  As to many laid off employees, Defendants made none of the required payments, breaching their severance contracts.

59.     Defendants again missed payroll on June 30, 2022. When questioned about this missed payment and the company's financial stability, Pollen's co-founder and CEO, Callum Negus-Fancey, represented that the delay was due to Pollen "closing a transaction with a large, well-known entertainment company," and was "an isolated, one-off event."  When questioned about whether Pollen would meet payroll going forward, he responded:  "Yes, absolutely we can."

60.     Throughout June, July, and August of 2022, senior management, including Mr. Negus-Fancey and Chief People Officer Anne Bedi at his direction, continued to make similar misrepresentations to employees, representing that their jobs were secure, that they would be paid, and that normal payroll would resume within days.  Mr. Negus-Fancey represented that missed payroll would "never happen again."  Ms. Bedi also represented that all employee benefits were still being handled through TriNet and were unaffected by the short-term issues.

61.     These representations were knowingly false.  At the time of the representations, Pollen's management, including Mr. Negus-Fancey, knew that Defendants lacked funds to pay past-due wages to employees and had no reasonable prospect of doing so.  In addition, Defendants had terminated employees' medical insurance and 401(k) benefits through TriNet in June 2022 without telling them.

62.     In early and mid-July, Defendants made a payment to U.S. employees via wire transfer rather than their ordinary payroll process, reflecting the pay period through June 30. Defendants paid employees net pay, reflecting deductions for benefits and 401(k) contributions. Defendants, however, never made the required benefits contributions.

63.     After the wire-transfer, Defendants paid employees no further wages.  They paid employees nothing for the period from July 1 to August 10, 2022.  Defendants have since acknowledged that many employees are due wages "in arrears" for this period and are "creditors" of the company.

64.     Defendants also secretly cancelled employee benefits in June 2022.  Employees learned in early August that they had been without medical insurance for weeks.  Some learned only after having received medical treatment during that period.  In addition, 401(k)

15

contributions, including Defendants' contributions and those of employees, were removed from employees' accounts due to Defendants' failure to fund.

## IV.   Pollen Engages in Mass Layoffs Without Notice

65.   On August 9, 2022, Pollen announced that it was entering administration in the United Kingdom and had retained Kroll to restructure its operations.  StreetTeam UK formally commenced administration on August 16.

66.   On August 10, 2022, Defendants notified hundreds of remaining employees, including Plaintiffs, that they were being made "redundant"—*i.e.*, laid off—effective immediately.  It did not give them 60 days' notice as required by the WARN Act or state equivalents.  Nor did it pay them their final wages due on termination, inclusive of vacation and other compensable time.

67.   Defendants have paid none of the wages owed for the period after the layoffs due to the inadequate notice.

## V.   Pollen Continues to Operate

68.   Even after purportedly closing down its business and entering administration, Pollen has continued to conduct business in the United States.

69.   After terminating the large majority of its workforce, Pollen nonetheless retained a skeleton crew of U.S.-based employees and continued to market and promote events through JusExperiences.  All of the revenues of the operation are now directed offshore and beyond the reach of Plaintiffs and members of the class.  On information and belief, Pollen continues to operate through JusExperiences in order to avoid valid debts of Plaintiffs and others, and to avoid restrictions and oversight by virtue of the administration proceedings.

## VI.    **Pollen Begins Liquidating U.S. Assets.**

70.     After the asserted shutdown of its operations in August 2022, Pollen has engaged in ongoing, active efforts to sell off its remaining U.S. business without making any provision for payment of unpaid wages, which represent priority and secured claims.

71.     In late August or early September, without informing Plaintiffs or the class, or making any provision for repayment of back pay or benefits, Defendants sold the entirety of their U.S.-based college travel business, which operates under the brand "Campus Vacations."

72.     Defendants used none of the proceeds of this sale to pay any of the past-due wages or benefits owed Plaintiffs and the class.

73.     On information and belief, Defendants continue to engage in efforts to sell the remainder of their U.S. assets, intellectual property, and business lines while making no provision for the payment of past-due wages.

## CLASS AND COLLECTIVE ACTION ALLEGATIONS

## I.    **Class Allegations**

74.     **Class Definitions**.  Plaintiffs seek to represent the following classes and subclasses:

    a)     **Employee Class**.  All current and former employees of Defendants who have failed to receive earned wages, benefits, or expense reimbursements from Defendants during 2022.

    b)     **Wages Subclass.**  All members of the Employee Class who have failed to receive earned wages.

c)      **Reimbursement Subclass.**  All members of the Employee Class who incurred reasonable and necessary expenses resulting from their employment, which Defendants failed to reimburse.

d)      **Final Wages Subclass.**  All members of the Employee Class for whom Defendants failed to pay final wages upon termination.

e)      **New York  Subclass.**  All members of the Employee Class who were employed by Defendants in the State of New York.

f)      **California Subclass**.  All members of the Employee Class who were employed by Defendants in the State of California.

g)      **Layoff Class**.  All former employees of Defendants who were laid off by Defendants in May 2022 and August 2022.

h)      **State Layoff Subclass**.  All members of the Layoff Subclass who were employed by Defendants in the States of New York, California and Illinois.

i)      **Severance Class**.  All former employees of Defendants who entered into severance agreements with Defendants in 2022 and whose promised severance was not paid by Defendants.

Plaintiff reserves the right to modify these class definitions as information is developed during discovery.

75.     **<u>Numerosity.</u>**  The stated class are estimated to include over 200 members each, and the subclasses are estimated to include at least 40 members, meaning that the classes and subclasses are so numerous that joinder of the all members is impracticable.

76.    **Typicality**.  Plaintiffs' claims are typical of those of members of the class and subclasses.  Each of Plaintiffs is a member of the Employee Class and the Layoff Class.  Plaintiff Ibekwe is a member of the Severance Class.

77.    **Adequacy**.  Plaintiffs will fairly and adequately protect the interests of the putative classes.  They have retained experienced counsel competent in the fields of employment law and class/representative litigation.  Plaintiffs have no interests that are contrary to the interests of the classes.

78.    **Superiority**.  A class action is the superior method of adjudicating this dispute in a fair and efficient manner.  Each of the members of the class and subclasses suffered the same injury by virtue of the same conduct on the part of Defendants.  Due to the relatively small damages suffered by each member, the burden of individual litigation would make it impossible or unreasonably difficult to seek redress.

79.    **Common Questions**.  Common questions of law and fact predominate because Defendants have acted in an identical manner with regard to each class member.  Among other common questions of fact and law are:

a.    Whether Defendants acted as a common enterprise, alter egos, or joint employers with one another;

b.    Whether JusExperiences is a successor to the other Defendants and, thus, bound by their obligations to Plaintiffs and Class Members;

c.    Whether the Individual Defendants are "employers" within the meaning of the FLSA and state laws;

d.    Whether Defendants entered into binding employment contracts with members of the Employee Class;

e.      Whether Defendants entered into binding severance agreements with members of the Severance Class;

f.      Whether Defendants failed to timely pay the earned wages of Employee Class members throughout 2022, including failing to pay any wages after June 30, 2022;

g.      Whether Defendants failed to timely reimburse members of the Employee Class for reasonable and necessary business expenditures;

h.      Whether Defendants failed to timely make promised benefits contributions, including insurance and 401(k) contributions and matching;

i.      Whether Defendants failed to make severance payments to members of the Severance Class as required by the severance agreements;

j.      Whether Defendants breached their contracts with class members by failing to pay wages and provide benefits agreed to be paid;

k.      Whether Defendants were required to give notices of impending layoffs under the WARN Act and state equivalents;

l.      Whether Defendants failed to give appropriate WARN Act notices before laying off class members and whether they had any legal excuse or justification for failing to do so;

m.      Whether Defendants failed to pay laid off employees their final wages (inclusive of vacation and other compensable time) upon termination;

n.      Whether Defendants' failure to pay final wages was "willful" or intentional within the meaning of state labor laws, entitling class members to penalties;

o.       Whether Defendants' conduct, as alleged herein, was fraudulent, unfair, or unlawful as provided in the Unfair Competition Law, California Business and Professions Code § 17200;

p.       Whether class members are entitled to be paid in priority to other creditors and whether they have a security interest in Defendants' assets by virtue of their wage claims.

80.     **Manageability.**  Plaintiffs are unaware of any reason why a class action would not be manageable.  Instead, trial of this action would be manageable as Plaintiffs' and class members' claims are substantially identical, resulting from Defendants' admitted failure to pay earned wages and undisputed failure to provide employee benefits.

81.     **Statutory Basis.**  Plaintiffs seek class certification pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3).

## II.   **FLSA Collective Action**

82.     Plaintiff seeks to pursue claims under the FLSA as a collective action on behalf of all persons who were employees of Defendants during 2022 and who were not timely paid minimum wage and/or overtime by virtue of Defendants' failure to pay wages (the "Collective Action Members").

83.     There are numerous, similarly situated, former employees of Defendants throughout the country who were not paid required minimum wage or overtime (or anything) by Defendants due to Defendants' failure to timely pay wages and ultimate failure to pay any ways after June 30, 2022.  These employees would benefit from the issuance of a Court-supervised notice of this lawsuit and the opportunity to join.  The similarly situated employees are known to Defendants and readily-identifiable through Defendants' records.

84.     Plaintiffs are similarly situated to the other employees as they were also employed by Defendants and Defendants failed to timely and appropriately pay them wages or overtime as described above.

85.     Plaintiffs have consented in writing to the filing of an FLSA collective action.

**<u>FIRST CAUSE OF ACTION</u>**
**(Violation of the WARN Act)**
***On Behalf of Plaintiffs and the Layoff Subclass***
***Against All Defendants***

86.     Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

87.     Defendants are a qualifying employer under the WARN Act.  Defendants employed more than 100 full-time employees in the United States who had been employed for at least six months of the 12 months preceding the layoffs.

88.     The WARN Act, 29 U.S.C. § 2102, required Defendants to provide at least 60 days prior written notice of termination, or to provide notice as soon as practicable, to all affected employees, explaining why 60 days' notice was not given.

89.     Defendants engaged in a series of layoffs of Plaintiffs and other members of the Layoff Subclass in May and August 2022, which qualified for a 60-day warning under the WARN Act.  Defendants terminated most employees staffed at their primary Los Angeles office, reflecting more than 33% of their workforce overall, more than 33% of the workers staffed from the Los Angeles office, and over 50 employees.

90.     Defendants failed to provide the required WARN Act notices to Plaintiff or other members of the Employee Class.  Defendants also failed to pay Plaintiffs or other similarly situated employees their wages, salary, benefits, and accrued vacation during the 60 working days following their terminations.  On information and belief, Defendants also failed to give

22

required notice to the appropriate state dislocated worker unit or other appropriate government agencies.

91.     Plaintiffs and other similarly situated employees have been damaged by this failure and are entitled to back pay and associated benefits for the 60-day period following their respective terminations.

**SECOND CAUSE OF ACTION**
**(Violation of the State Mini-WARN Acts)**
*On Behalf of  Plaintiffs and the State Layoff Subclass*
*Against All Defendants*

92.     Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

93.     Defendants' primary office in the United States was in Los Angeles, California. Although many employees worked remotely during the COVID-19 pandemic, all or substantially all of them were staffed through the Los Angeles office.  Defendants' Los Angeles headquarters constitutes a "covered establishment" or worksite with respect to all employees staffed through that office.

94.     Defendants are a qualifying employer under the "mini-WARN" acts of California, Illinois, and New York, having employed 75 or more employees during the 12 months preceding the mass layoffs alleged herein.

95.     Defendants engaged in mass layoffs in May and August 2022, including laying off 50 or more employees, comprising more than one third of the employees.

96.     Defendants failed to give 60 days' advance written notice of the layoffs as required and have not paid employees any wages or benefits for the 60 days following the layoffs.

97.     Plaintiff and other similarly situated employees have been damaged by this failure and are entitled to back pay and associated benefits for the 60-day period following their respective terminations.

### THIRD CAUSE OF ACTION
**(Failure to Pay All Wages)**
***On Behalf of Plaintiffs and the Wage Subclass***
***Against All Defendants***

98.     Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

99.     Defendants were the employer and joint employers of Plaintiffs and other members of the Wage Subclass.  Each of the Individual Defendants is liable for the acts and omissions alleged below as persons acting on behalf of an employer within the meaning of state laws.

100.    Defendants were required, pursuant to state laws and common law to pay Plaintiffs and members of the Wage Subclass all wages earned during the course of their employment, including, at least, minimum wage and overtime.

101.    The requirement to pay earned wages when due was imposed by both common law and state labor statutes, including the following:

| State | Statutes |
|---|---|
| California | Cal. Lab. Code §§ 201, 204, 510, 1194, 1197, and 1198. |
| Florida | Fl. Const. Art. X, Sec. 24; Fla. St. §§ 448.01(2), 448.110, and common law. |
| Georgia | Ga. St. § 34-4-3, |
| Illinois | 820 ILCS 105/4, 105/4a, 115/3, 115/4 |
| Massachusetts | Mass. Gen. Laws, ch. 149 § 148, ch. 151 §§ 1, 1A. |
| Missouri | Mo. Rev. St. § 290.080, 290.502, 290.505 |
| Nevada | N.R.S. 608.016, 608.018, 608.020, 608.060, 608.080, 608.195, and 608.250. |
| New York | N.Y. Lab. Law § 191, 193, 652, and 656, and New York State Minimum Wage Orders |
| Rhode Island | RI St. §§ 28-12-3, 28-12-4.1, 28-14-2.2. |

| Texas | Tex. Lab. Code § 61.011, 61.013, 61.014, 61.016, 61.017, 61.051 |
| Washington, DC | DC Code §§ 32-1003, 32-1302, and 32-1304. |

102.    Defendants failed to pay Plaintiffs and other members of the Wage Subclass all their earned wages when due.  Defendants consistently failed to pay employees on the regular paydays from December 2021 through August 2022 and failed to pay employees any wages for the period after June 30, 2022 through their terminations.  Defendants also failed to pay employees' final wages upon termination or thereafter.

103.    As a result of these acts, Defendants also necessarily failed to pay Plaintiffs and members of the Employee Class minimum wage for all hours worked and appropriate overtime.

104.    As a result of Defendants' failure to pay Plaintiffs' and class members' earned wages, Plaintiffs and class members have suffered damages in an amount to be proven at trial. Plaintiffs and other class members are entitled to recover unpaid wages, minimum wage, and overtime, interest thereon, penalties, and liquidated damages.

## FOURTH CAUSE OF ACTION
### (Failure to Reimburse)
*On Behalf of Plaintiffs and the Reimbursement Subclass*
*Against All Defendants*

105.    Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

106.    The Entity Defendants were the employer and joint employers of Plaintiffs and other members of the Reimbursement Subclass.  Each of the Individual Defendants is liable for the acts and omissions alleged below as persons acting on behalf of an employer within the meaning of state law.

107.    Defendants were required to reimburse Plaintiffs and other members of the Reimbursement Subclass for their reasonable and necessary business expenses pursuant to common law and the following statutes:

| State | Statutes |
|---|---|
| California | Cal. Lab. Code § 2802 |
| Illinois | 820 ILCS 115/9.5 |
| Missouri | Mo. Rev. St. § 320.215 |
| New York | N.Y. Lab. Law § 198-C. |
| Washington, DC | DC Admin. Code, Rules 7-908, 7-909, and 7-910 |

108.    Plaintiffs and other members of the Reimbursement Subclass incurred reasonable and necessary expenses in direct consequence of the discharge of their duties and obedience to the directions of Defendants.

109.    Defendants have failed to reimburse any such expenses after June 30, 2022 if not earlier.

110.    Defendants' failure to reimburse Plaintiffs' and class members' reasonable and necessary business expenses has harmed Plaintiff and class members in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**(Failure to Pay Wages Due at Termination)**
*On Behalf of Plaintiffs and the Final Wages Subclass*
*Against All Defendants*

111.    Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

112.    Defendants were the employers and/or joint employers of Plaintiffs and members of the Final Wages Subclass.  The Individual Defendants are liable for the acts and omissions alleged herein as persons acting on behalf of an employer.

113.    Defendants were required to pay employees all wages due immediately upon termination, inclusive of vacation time and other accrued, compensable time, pursuant to state labor laws, including:

| State | Statutes |
|---|---|
| California | Cal. Lab. Code § 201. |
| Illinois | 820 ILSC 115/5 |

26

| Massachusetts | Mass. Gen. Laws, ch. 149, § 148 |
| Missouri | Mo. Rev. St. § 290.110 |
| Nevada | N.R.S. 608.020, 608.030, 608.040. |
| New York | N.Y. Lab. Law §§ 191, 193 |
| Rhode Island | RI St. § 28-14-14 |
| Tennessee | Tenn. Code § 50-2-103 |
| Texas | Tex. Lab. Code § 61.014 |
| Washington, DC | DC Code § 32-1303 |

114.    Defendants terminated Plaintiffs and members of the Final Wages Subclass in May and August 2022.  Defendants failed to pay any of them their final wages, vacation, or other accrued compensable time at that time or thereafter.

115.    Defendants' failure to pay Plaintiff and other class members their final wages promptly upon termination was willful.  Defendants have no valid excuse for their failure to pay departing employees' final wages and failed to pay these final wages intentionally and willfully.

116.    As a result of Defendant's failure to timely pay Plaintiffs and other class members their final wages, Plaintiff and other class members have been damaged in an amount to be proven at trial.  Plaintiff and other class members are also entitled to statutory penalties and liquidated damages.

### SIXTH CAUSE OF ACTION
**(Violation of Fair Labor Standards Act)**
*On Behalf of Plaintiffs and the Collective Action Members*
*Against All Defendants*

117.    Plaintiffs repeat and re-allege each of the foregoing allegations as though fully set forth herein.

118.    Plaintiffs expressly consent in writing to be parties to this action pursuant to 29 U.S.C. § 216(b).

119.    Plaintiffs are subject to "Enterprise Coverage" under the FLSA on the grounds that Defendants have done an annual dollar of volume of sales or business of at least $500,000. Further, Plaintiffs are covered under the FLSA on the grounds that their employment and job

27

duties regularly and consistently involved interstate commerce through interstate, online sales of event admission and lodging and online event promotion.

120.    As alleged in detail above, during 2022, Defendants repeatedly failed to pay employees, including Plaintiffs and Collective Action Members, in a timely manner on regular paydays.  In addition, Defendants failed to pay any of the Collective Action Members between July 1, 2022 and their dates of termination.

121.    Defendants necessarily failed to pay Plaintiffs and other Collective Action Members federally mandated minimum wage and overtime by virtue of their failure to pay their wages.  Defendants' conduct violates and continues to violate the FLSA, including 29 U.S.C. §§ 206, 207 and 215.

122.    The foregoing conduct constitutes a willful and bad faith violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

123.    Due to the foregoing violations, Plaintiffs and Collective Action Members, are entitled to recover from Defendants their unpaid wages, overtime, an additional amount equal to wages and overtime as liquidated damages, and other remedies.

**<u>SEVENTH CAUSE OF ACTION</u>**
**(Unfair Business Practices)**
***On Behalf of Plaintiff and the California Subclass***
***Against All Defendants***

124.    Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

125.    Defendants engaged in unfair and unlawful business practices against Plaintiffs and other members of the California Subclass, including (a) failure to pay earned wages, failure to pay minimum wage and overtime under the California Labor Code and the FLSA, (b) failure to pay wages due on termination, (c) failure to provide proper notice of layoffs under the WARN

28

Act and Cal-WARN Act, (d) failure to fund insurance premiums as promised; (e) fraudulently representing to employees that they would continue to receive wages and were continuing to receive health coverage and 401(k) benefits when they were not; (f) entering into fraudulent severance agreements with no intention to perform; (g) failure to reimburse reasonable and necessary business expenses; and (h) failure to provide accurate itemized wage statements as required by California Labor Code § 226.

126.    This conduct amounted to unlawful business acts and practices under California Business & Professions Code § 17200 in that it violated multiple state laws and regulations as described in detail below.

127.    The conduct amounted to unfair and fraudulent conduct under California Business & Professions Code § 17200.  Defendants falsely assured Plaintiff and other class members that they would receive their past due wages, and had nothing to worry about regarding payment of wages.  They also assured Plaintiff and class members that they were continuing to receive insurance and other benefits, and actively concealed the fact that they had terminated employee benefits.  Defendants engaged in this conduct to induce employees to continue working without pay or benefits.  Defendants further entered into severance agreements with certain employees, in order to avoid employee lawsuits and keep up the ruse that Defendants were operating a viable business, with no intention to perform.  Defendants' conduct amounted to theft of labor.  The benefit to Defendants of this conduct was substantially outweighed by the harm to employees who continued to work in reliance on Defendants' false representations without receiving compensation, and who failed to receive benefits to which they were entitled.

128.    Plaintiff and other members of the California Subclass have lost money or property by virtue of Defendant's unlawful business acts and practices, including vested and

29

earned wages, reimbursement of expenses, benefits to which they were entitled, and guaranteed

severance, as required under California Business & Professions Code § 17204.  These wages,

benefits, and severance, were vested and constituted a property right of employees as provided in

California law.

129.    Accordingly, Plaintiff and other members of the California Wage Subclass are

entitled to restitution of the vested and earned wages, minimum wage, final wages, overtime,

reimbursement, and benefits, which Defendants have unlawfully failed to provide them.

**EIGHTH CAUSE OF ACTION**
**(Breach of Employment Contract)**
***On Behalf of Plaintiffs and the Employee Class***
***Against All Defendants***

130.    Plaintiffs repeat and re-allege each of the foregoing allegations as though fully set

forth herein.

131.    Defendants entered into a series of employment agreements with Plaintiffs and

members of the Employee Class on standard terms (the "Employment Agreements").  The

Employment Agreements generally took the form of standard written contracts.  Other

employees had oral or implied contracts based on their performance of services in exchange for

compensation. The Employment Agreements were binding and enforceable and required

Defendants, among other things, to pay Plaintiffs and members of the Employee Class agreed-

upon wages, to provide the benefits, including health insurance benefits and 401(k)

contributions, and to reimburse reasonable and necessary business expenses.

132.    Plaintiffs and members of the Employee Class performed all of their material

obligations under these Employment Agreements by remaining employed and continuing to

work for Defendants.  All conditions to Defendants' performance were either satisfied or waived.

133.    Defendants breached the Employment Agreements as follows:

    a.    By repeatedly failing to pay wages on time from December 2021 through August 2022;

    b.    By failing to pay any wages beginning no later than July 1, 2022;

    c.    By failing to provide agreed-upon health benefits or to make guaranteed 401(k) contributions, beginning in or about June 2022; and

    d.    By failing to reimburse reasonable and necessary business expenses on behalf of employees.

134.    Plaintiffs and members of the Employee Class have been damaged by Defendants' breaches of the Employment Agreements.  They have not received the wages and benefits or reimbursements to which they were entitled.

### NINTH CAUSE OF ACTION
**BREACH OF SEVERANCE CONTRACT**
***On Behalf of Plaintiff Ibekwe and the Severance Class***
***Against All Defendants***

135.    Plaintiffs repeat and re-allege each of the foregoing allegations as though fully set forth herein.

136.    Plaintiff Ibekwe and members of the Severance Class entered into binding severance agreements (the "Severance Agreements") with Defendants by which they agreed to release claims against Defendants in exchange for severance payments.

137.    Plaintiffs and members of the Severance Class performed all of their material obligations under the Severance Agreements by releasing their claims against Defendants.  All conditions to Defendants' performance were satisfied or waived.

138.    Defendants breached their obligations under the Severance Agreements by failing to make the agreed-upon severance payments.  This breach was a material breach of the Severance Agreements.

139.     On information and belief, at the time they entered into the Severance

Agreements, Defendants had no intention of performing and no reasonable prospect of

performing.  Instead, on information and belief, Defendants entered into the Severance

Agreements for the sole purpose of preventing former employees from suing them in order to

keep up the illusion that Defendants were operating a viable business.

140.     Plaintiffs and members of the Severance Class have been harmed by these

breaches by failure to receive the severance payments to which they are entitled.

141.     As an alternative remedy, members of the Severance Class are entitled to rescind

the severance agreements and pursue their outstanding claims against Defendants on the grounds

of material breach and fraudulent inducement.

### TENTH CAUSE OF ACTION
**(Failure to Provide Accurate Itemized Wage Statements)**
***On Behalf of Plaintiffs and the California Subclass***
***Against All Defendants***

142.     Plaintiffs repeat and reallege each of the foregoing allegations as though fully set

forth herein.

143.     Pursuant to California Labor Code § 226(a), Defendants were required to provide

Plaintiffs and members of the California Subclass accurate, itemized statements on at least a

semi-monthly basis, including the following gross wages earned; all deductions; net wages;

inclusive dates of the pay period; and the name and address of the legal entity that was their

employer.

144.     Defendants willfully and repeatedly violated section 226.  Defendants failed to

properly identify the legal name of Plaintiffs' and class-members' employer, including by using

erroneous corporate names and designations.  Moreover, beginning on June 30, 2022,

Defendants failed to provide any wage statements whatsoever to Plaintiffs and members of the California Subclass.

145.     Plaintiffs and members of the California Subclass were harmed by the defective wage statements.  The defective wage statements prevented Plaintiffs from identifying the true name of their employer, from determining their appropriate deductions and learning that Defendants had failed to provide promised benefits, and from calculating the amounts owed them.

**ELEVENTH CAUSE OF ACTION**
**(Fraud)**
***On Behalf of Plaintiffs and the Employee Class***
***Against All Defendants***

146.     Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

147.     From May to August 2022, Defendants made a series of false representations of fact and false promises to Plaintiffs and the Employee Class.

**I.     False Representations About Payroll Delays**

148.     Defendants repeatedly missed normal payroll from December 2021 through June 2022.  During this time, Defendants repeatedly blamed their payroll processor, TriNet.  TriNet was not responsible for the delays and, on information and belief, the delayed and missed payroll was due to Defendants' undisclosed financial distress.

II.    **False Representations Regarding Ability to Pay and Resumption of Normal Payroll and Benefits**

149.    After Defendants fell behind in payroll, starting in late June 2022, Defendants made a series of false representations regarding their ability to pay employees' wages going forward.  These representations included, without limitation, the following:

e.    When Pollen's CEO, Callum Negus-Fancey publicly reported that the missed June 30, 2022 payroll was an "isolated, one-off event" and when asked if Pollen could continue to make payroll, he represented "yes, absolutely we can."

f.    In a series of messages posted to the company Slack platform on or about July 5, 2022, Chief People Officer, Anne Bedi, wrote to all staff that employees would continue to receive ordinary payroll shortly, that payroll would resume imminently through the ordinary payroll system, and that "your benefits are being handled by TriNet and are unaffected."

g.    On July 15, 2022, Ms. Bedi represented in an email to all staff that Pollen was working to deliver the July 15, 2022 paycheck "next week" and that "[f]rom that point on, payment schedules will be back to normal."  Ms. Bedi also represented that employees would receive an extra paycheck once normal payroll resumed.

h.    On July 21, 2022, Ms. Bedi wrote to all employees that they would receive their next paycheck "next week rather than tomorrow," and "[f]rom then on wee will be back on or normal payroll cycle."

i.    On July 29, 2022, Ms. Bedi wrote to all employees that it was "very likely" that Pollen would join the health insurance of its "new partner," and that Pollen would "continue to cover the portion of your health insurance premium that we normally pay, plus the 2% Cobra fee."

34

**III.**     **False Representations About Potential "Partnership" or Acquisition**

150.     From July into August 2022, Defendants continually represented to employees that they were in the final stages of a transaction that would allow Defendants to pay all owed wages.  These representations included, without limitation, the following:

a.     On June 30, 2022, Callum Negus-Fancey posted a companywide message on the Slack platform, representing that he was working to "get them to wire funds" and that "everything is agreed with them … so our shareholders are now happy to fund.  We will make sure to get this to you as fast as possible and really recognize how difficult pay being even a couple of says late can be."  He went on, "I assure you this [missed payroll] will never happen again."

b.     On July 13, 2022, Mr. Negus-Fancey wrote in an email to all employees that Pollen had "reached the final stages of negotiation with one of the largest entertainment companies in the world."

c.     On July 14, 2022, Mr. Negus-Fancey represented to all employees that he hoped to "complete [negotiations] over the weekend," which would "bring a huge amount to Pollen."

151.     Each of these representations was false.  Defendants had no reasonable prospect of resuming normal payroll and had, in fact, terminated all employee benefits in June 2022, a fact that Defendants actively concealed from employees.  Further, even if Defendants completed the contemplated transaction or "partnership," it would not have generated nearly enough money to pay the outstanding wages and benefits owed to employees, in light of Defendants' other outstanding obligations.

152.     Defendants knew these representations were false when Defendants made them. Defendants knew that normal payroll could not and would not resume, and that benefits had already been terminated.  Defendants further knew that the contemplated transaction would only yield a fraction of the money necessary to cover the missed payroll and Defendants other obligations.

153.     Defendants intended Plaintiffs and the Employee Class to rely on the representations.  Defendants made the false representations for the specific purpose of inducing employees to continue to work without pay, while Defendants' principals arranged to sell the company.

154.     Plaintiffs and the Employee Class reasonably relied on these representations. They had no reason to believe that Defendants' representations were false.  When employees contacted Defendants to inquire further about the representations, Defendants continued to reassure them that normal payroll would resume, and that the late payroll was a minor setback.

155.     Plaintiffs and the Employee Class were harmed by this reliance.  They continued to work from July 1, 2022 through August 10, 2022 without pay or benefits in reliance on Defendants' false representations.  This amounts to wage theft through false pretenses.

156.     Plaintiffs' reliance on Defendants' false representations was a substantial factor in causing this harm.  But for this reliance, Plaintiffs would not have lost out on their earned wages and benefits.

## TWELFTH CAUSE OF ACTION
### (Failure to Pay Wages Timely in Violation of NYLL § 191)
*On Behalf of Plaintiffs and the New York Subclass*
*Against All Defendants*

157.    Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

158.    The timely payment of wages provisions of NYLL § 191 apply to Defendants and protect Plaintiffs and the New York Subclass.

159.    Defendants failed to pay Plaintiffs and members of the New York Subclass on a timely basis as required by NYLL § 191.

160.    Plaintiffs and members of the New York Subclass were not exempt from the requirement that Defendants timely pay them for all hours worked under the NYLL.

161.    As a result of Defendants' failure to timely pay Plaintiffs and members of the New York Subclass their wages for all hours worked, Defendants violated the NYLL.

162.    Defendants' violations of the NYLL have significantly damaged Plaintiffs and members of the New York Subclass.

163.    Plaintiffs and members of the New York Subclass were harmed by the defective wage statements.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and similarly situated employees, pray that the Court enter judgment in their favor and against Defendants, containing the following relief:

A.     That the Court determine that this action is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23 and a collective action under the FLSA, and certify it as a class and collective action;

B.     For damages according to proof a trial, including earned and unpaid wages, minimum wage, overtime, vacation time, severance, insurance benefits, and reimbursement of expenses;

C.     For pay and benefits for the 60 days following Plaintiff and other employees' layoffs, and associated penalties for failure to provide sufficient notice of layoffs;

D.     For penalties and liquidated damages as provided by statute;

E.     For actual and liquidated damages pursuant to the FLSA;

F.     With respect to the Severance Class only, for rescission of the severance agreements and a declaration that the obligations therein are no longer binding on members of the Severance Class;

G.     For attorney's fees and costs including, without limitation, under 29 U.S.C. §§ 216 and 2104, NY Lab. Law §§ 198 and 663, California Labor Code §§ 218.5, 226(h), 1194, 1404, NRS 608.140, Fl. St. 448.01, Ga. St. § 34-4-6, DC Code §§ 32-1012 and 32-1308, Mo. Rev. St. § 290.257, 820 ILSC 105/12 and 115/14, Mass. Gen. Law, ch. 151, § 20; RI Stat. §§ 28-14-19.2 and 28-14-20(e);

H.     With respect to the Severance Class, for attorney's fees as provided by the severance agreements;

I.     For appointment of a receiver to gather and marshal the assets of Defendants, including assets fraudulently transferred to third-parties;

J.      For punitive damages on account of Defendants' willful, malicious, oppressive, and fraudulent conduct;

K.      For costs as provided by law;

L.      For prejudgment interest; and

M.      For such other and further relief as the Court deems just and proper.

<u>**JURY DEMAND**</u>

Plaintiff demands a trial by jury on all issues of fact and damages.

Dated: February 28, 2023
       New York, New York                  Respectfully Submitted,

**WIGDOR LLP**

By: _____
       Valdi Licul
       Sagar K. Shah

85 Fifth Avenue
New York, New York 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
vlicul@wigdorlaw.com
sshah@wigdorlaw.com

and

**DIAMOND McCARTHY LLP**

Richard Janvey
Damion Robinson (*Pro hac vice* application forthcoming)

333 S. Hope Street, Suite 4959
Los Angeles, CA 90071
Telephone: (424) 278-9518
Facsimile: (713) 333-5199
damion.robinson@diamondmccarthy.com

*Counsel for Plaintiffs*